# IN THE UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| DEBRA L. TOLBERT, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 09-CV-559-PJC |
| | ) |
| MICHAEL J. ASTRUE, Commissioner of the | ) |
| Social Security Administration, | ) |
| | ) |
| Defendant. | ) |

## OPINION AND ORDER

Claimant, Debra L. Tolbert ("Tolbert"), pursuant to 42 U.S.C. § 405(g), requests judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying her application for disability insurance benefits under the Social Security Act, 42 U.S.C. §§ 401 *et seq*. In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before a United States Magistrate Judge. Any appeal of this order will be directly to the Tenth Circuit Court of Appeals. Tolbert appeals the decision of the Administrative Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ incorrectly determined that Tolbert was not disabled. For the reasons discussed below, the Court **AFFIRMS** the Commissioner's decision.

### Claimant's Background

At the time of the hearing before the ALJ on December 8, 2008, Tolbert was 51 years old. (R. 24). She asserted onset of disability on October 31, 2000. *Id.* Tolbert completed ninth grade and obtained a GED. *Id.* She obtained a certificate as a medical assistant in vocational school in 1990. (R. 26-27). She obtained a certificate to be an administrative assistant in 2005 when she was attempting to retrain after the 2000 accident that she asserted caused her disability. (R. 25).

Tolbert fell on the job in October 2000 injuring her neck, back, shoulder, right arm, and right hand. (R. 27-28). She had one neck surgery with hardware insertion, and she had three procedures on her back, one of which was hardware removal. (R. 28). These occurred in 2001 and 2002. (R. 29-30).

Tolbert testified that she never received pain relief in her lower back after the surgeries. (R. 30). At the time of the hearing, she still experienced pain in her left hip that went down her left leg and foot. *Id.* Her neck pain went down her shoulder, left arm, and left hand. *Id.* She said the same pain was happening during the relevant time period between 2000 and 2003. *Id.* Tolbert testified that during the relevant time period, she couldn't walk. (R. 30). She used a cane to walk in 2001 and 2002. (R. 31). She was able to walk eventually by gradually increasing her amount of walking after the surgery. (R. 32-33). During the relevant time period, the pain was a hot, sharp, burning pain, and there was also numbness. (R. 30). She had severe pain every day. *Id.* At the time of the hearing, the pain was not as severe, but was there. (R. 33).

She had problems after the accident with moving her neck, and that improved somewhat with the surgery. *Id.* The neck pain did not improve after the surgery. *Id.* She described the pain as burning, with tingling and numbness down her arm and hand. (R. 34). She also had severe headaches, which began right after the injury and have continued since then. (R. 34-35). The headaches were better if she limited her activity. (R. 35). When she had a headache, she could get some relief by lying down. (R. 35-36). She also used pain medication and ice packs on her shoulder to get relief. (R. 36). She had headaches at least four or five times a week. *Id.*

After the neck surgery, the pain and tingling in her right arm improved enough to be tolerable, but her left side did not improve. (R. 37). Her left side also was weaker, and she had grip

problems, including dropping things. (R. 37-38). She could do fine finger movements with her right hand, but not with her left. (R. 38-39). She limited her use of her left arm, because if she used it too much, it caused a burning pain in her shoulder and neck. (R. 39). She could not extend either arm fully upward, but she could reach up more with her right hand than her left. (R. 40). She could do work with her right hand in front of her, but not with her left. *Id.*

Tolbert's neck pain limited her ability to work at a computer screen. (R. 40-41). After about 10 or 15 minutes, pain started in her neck, then down her left shoulder and arm. (R. 41). She would then need to lie down and use ice. *Id.* She could not look over her shoulders, but she had more ability to move up and down with her neck than side-to-side movement. *Id.*

During the relevant period, she had problems with concentration and memory. (R. 42). She was depressed. (R. 43). She did not want to get out of bed, and she had feelings of worthlessness. *Id.* After the relevant time period, she saw a psychologist, and her depression improved. *Id.*

Tolbert testified that during the relevant period, she could stand or walk for about 30 minutes before needing to change positions. (R. 44). She could sit for about 45 minutes. (R. 45). She couldn't touch her toes, but she thought she could touch her knees. *Id.* She couldn't squat, because the numbness would cause her to lose her balance. *Id.* She could climb a flight of stairs, but not very well, and she would have to stop to rest. (R. 45-46). She tried to drive after the injury but stopped driving because she felt that the restriction in her neck movement made it dangerous to drive due to her limited ability to turn her head. (R. 46).

Tolbert testified that her condition improved enough during the relevant period that she was able to do some light housework, such as dusting or doing dishes with help. (R. 47). She would not do any of the heavy housework, including vacuuming, sweeping, or mopping. *Id.* She thought she

3

could have picked up 5 pounds. (R. 47-48).

The administrative record before the Court includes documents from the offices of Richard A. Hastings II, D.O., who was apparently asked by Tolbert's attorney in a workers compensation proceeding to evaluate Tolbert. (R. 173-200). In Dr. Hastings' first evaluation on March 21, 2001, he reviewed the history of Tolbert's fall on October 31, 2000, and her medical treatment. (R. 194-200). He said that an MRI done on January 15, 2001 showed "a moderate sized disc herniation at L5 S1." (R. 195). At the time of the examination, Tolbert complained of pain over the cervical spine into her upper back and shoulders. *Id.* Pain increased when she moved her neck. *Id.* She had right arm pain with tingling. *Id.* Right shoulder pain was worse if she reached out. (R. 196). She had pain in her lower back which was worse with movements such as bending, and she had radicular pain down her left leg. *Id.*

Dr. Hastings said that his examination showed "chronic myofasciatis"[1] over the lower cervical spine. *Id.* There was pain in the right shoulder and shoulder blade, and Dr. Hastings said that "Jobe's" was positive. (R. 197). Pain was noted in the lumbar spine, and chronic myofasciatis was shown in T9 to T12. *Id.* It was Dr. Hastings' opinion that Tolbert was temporarily totally disabled from the time of the fall in October 2000 to the date of his examination. (R. 198).

Dr. Hastings evaluated Tolbert again on June 13, 2001 at Tolbert's request. (R. 188-93). Tolbert complained of increased pain in the two weeks prior to this evaluation. (R. 189). She could sit or stand for only 15 to 20 minutes. *Id.* He referred her for consultation with other physicians to consider surgery on her lumbar spine, her cervical spine, and her right shoulder. (R. 192-93).

---

[1]Myofasciitis is "[i]nflammation of a muscle and its fascia," and the "fascia" is "[a] fibrous membrane covering, supporting, and separating muscles." Taber's Cyclopedic Medical Dictionary 710, 1264 (17th ed. 1993).

4

John S. Marouk, D.O. saw Tolbert for evaluation of her lower back pain on July 6, 2001 by referral from Dr. Hastings. (R. 170-72). On examination, Dr. Marouk found that Tolbert had limited range of motion of her cervical spine, and he said that Spurling's test was positive for neck, shoulder, and arm pain. (R. 171). Tolbert had tenderness in her paraspinal muscles throughout her entire lumbar spine, worse at the L5/S1 level. *Id.* Straight-leg raising was positive on the left and negative on the right, and he described some symptoms in her left leg. *Id.* Dr. Marouk recommended lumbar decompression and arthrodesis at the L5/S1 level, and he wanted an orthopedic surgeon to assist with the surgery. (R. 172). He also recommended an MRI of Tolbert's neck and shoulder. *Id.* Randall Hendricks, M.D. then saw Tolbert on July 23, 2001 in preparation for the lumbar spine fusion surgery. (R. 150-51).

Records from Orthopedic Hospital of Oklahoma reflect that Tolbert had disc fusion surgery at the L5/S1 level in July 2001. (R. 402-30). At follow up appointments on August 13 and September 24, 2001, Dr. Hendricks thought that Tolbert was healing well. (R. 147-48). Dr. Marouk saw Tolbert on October 29, 2001 and said that Tolbert had made a significant amount of progress after the lumbar surgery. (R. 168). He wanted her to do physical therapy and also to consider cervical fusion for a ruptured disk at the C4/C and C5/C6 levels. *Id.* Tolbert had physical therapy. (R. 384-405).

Dr. Marouk saw Tolbert again on November 26, 2001, and she complained that her neck pain had been increasing. (R. 167). He recommended fusion surgery, and it was scheduled. *Id.* Tolbert had fusion surgery on her neck at levels C4/C5 and C5/C6 in December 2001. (R. 364-83). On December 26, 2001, Dr. Hendricks thought that Tolbert was healing well, and that the x-rays looked good. (R. 144). Tolbert saw Dr. Marouk on January 30, 2002, and he said the x-rays showed

good alignment from the surgery. (R. 162). He recommended Flexeril, ice packs, and/or massage for muscle stiffness in her back. *Id.* He said that she had no complaints regarding her upper extremity. *Id.* Dr. Hendricks also saw Tolbert on January 30, 2002, and he thought that Tolbert would "get a very satisfactory result." (R. 143). The x-rays showed good healing. *Id.* He said that Tolbert remained "temporarily and totally disabled." *Id.* On February 11, 2002, Dr. Hendricks wrote Tolbert's workers compensation attorney that Tolbert remained temporarily totally disabled. (R. 161). On March 6, 2002, Dr. Hendricks again said that the x-rays of Tolbert's cervical fusion showed good results. (R. 142). He said that he was releasing Tolbert into Dr. Marouk's care. *Id.*

Dr. Marouk saw Tolbert again on March 11, 2002, and said that she had some complaints of neck pain and choking. (R. 160). Regarding her low back, Tolbert's main complaint was intermittent left hip pain. *Id.* He recommended that she start physical therapy. *Id.* Tolbert again went to physical therapy. (R. 312-62). On April 15, 2002, Dr. Marouk said that Tolbert was "making slow progress." (R. 159). Dr. Marouk recommended that Tolbert do water-based physical therapy, and he said that he would have her work half days on light duty starting in two weeks and gradually increase her work. *Id.* On May 13, 2002, Tolbert saw Dr. Marouk with complaints of neck pain, shoulder pain, and arm pain, as well as low back pain. (R. 158). She wanted to have the instrumentation in her lower back removed. *Id.* Dr. Marouk recommended a myelogram and post myelographic CT of the cervical and lumbar spine, and he said that Tolbert would require a Functional Capacity Evaluation ("FCE") before returning to work. *Id.*

On June 17, 2002, Dr. Hendricks again saw Tolbert and said that the x-rays of the lumbar spine showed good fusion, and the myelogram and CT scan of the lumbar spine showed no neurologic impingement. (R. 141). He scheduled removal of the orthopedic hardware because

Tolbert had residual tenderness. *Id.* In July 2002, Tolbert had surgery to remove the hardware in her lower back. (R. 287-311). Physical therapy continued. (R. 229-49, 281-86). Dr. Hendricks saw Tolbert on August 7, 2002 and wrote that he was releasing Tolbert back to attending physician Dr. Marouk and he was "sure in the upcoming future Dr. Marouk will be asking [Tolbert] to return to gainful employment potentially with restrictions." (R. 138).

An FCE was completed at Orthopedic Hospital of Oklahoma on September 24, 2002. (R. 247-74). The report summary states that the results showed that Tolbert qualified for light work. (R. 254). Tolbert's physical effort was regarded as poor. *Id.* One reason why her effort was considered to be suboptimal was a positive result for her right hand on the rapid exchange grip test. (R. 260). Also, she had 5 positive "Waddell Signs," and the results form states that 3 or more positive Waddell Signs are considered to reflect "symptom magnification." (R. 272).

After the FCE was completed, Dr. Marouk wrote to Dr. Hastings on October 14, 2002 and stated that Tolbert had reached maximum medical improvement. (R. 153). He said that he allowed Tolbert "to return to work full duty with a 15 lb. weight restriction." *Id.* Dr. Marouk then wrote an impairment rating letter on October 18, 2002 stating that due to the surgeries Tolbert had a 45% impairment to the whole person. (R. 156).

Dr. Hastings wrote a letter dated December 7, 2002 stating that Tolbert had sustained a 36% permanent impairment to the whole person. (R. 175-87). He then stated that Tolbert was 100% permanently totally disabled and economically unemployable due to her injuries. (R. 186). He noted the FCE and its 15-pound limitation, and he stated that the FCE did not seem to take into account Tolbert's inability to sit, stand, or walk for prolonged periods of time. *Id.*

Dr. Hastings wrote a supplemental impairment rating letter on December 3, 2003 stating that

his previous letter had "inadvertently failed to include the patient's psychological overlay and clinical depression that had resulted from this on-the-job injury." (R. 173). Dr. Hastings found the psychological overlay and clinical depression to be a 5% permanent partial impairment to the whole person. *Id.*

Nonexamining agency consultant Janice B. Smith, Ph.D. completed a Psychiatric Review Technique form on April 5, 2007. (R. 201-14). Dr. Smith checked boxes stating that there was no medically determinable impairment and that there was a coexisting nonmental impairment. (R. 201). In the "Consultant's Notes" portion of the form, Dr. Smith explained that Tolbert alleged depression and was precribed Paxil by her treating physician. (R. 213). She said that there was no medical information indicating a severe mental impairment before her date last insured of September 30, 2003.

Nonexamining agency consultant Thurma Fiegel, M.D. completed a Physical Residual Functional Capacity Assessment on April 6, 2007. (R. 215-22). Dr. Fiegel found Tolbert's exertional limitations to be consistent with sedentary work. (R. 216). In the explanation, Dr. Fiegel recounted Tolbert's surgeries and noted that Dr. Marouk had released Tolbert back to work on full duty with a 15-pound lifting restriction on October 14, 2002. *Id.* She also said she gave controlling weight to this statement by Dr. Marouk. (R. 221). Dr. Fiegel found no other limitations. (R. 217-20).

**Procedural History**

Tolbert filed an application on February 6, 2007 seeking disability insurance benefits under Title II, 42 U.S.C. §§ 401 *et seq*. (R. 85-92). Tolbert alleged onset of disability as October 31, 2000. (R. 85). The application was denied initially and on reconsideration. (R. 56-60, 64-66). A

hearing before ALJ Lantz McClain was held December 8, 2008 in Tulsa, Oklahoma. (R. 21-53).

By decision dated February 4, 2009, the ALJ found that Tolbert was not disabled. (R. 13-20). On June 26, 2009, the Appeals Council denied review of the ALJ's findings. (R. 1-3). Thus, the decision of the ALJ represents the Commissioner's final decision for purposes of further appeal. 20 C.F.R. § 404.981.

## Social Security Law and Standard of Review

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A). Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. § 404.1520.[2] *See also Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988) (detailing steps). "If

---

[2]Step One requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510. Step Two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities. *See* 20 C.F.R. § 404.1520(c). If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied. At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1 ("Listings"). A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry. If not, the evaluation proceeds to Step Four, where the claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work. If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account his age, education, work experience, and RFC, can perform. *See Dikeman v. Halter*, 245 F.3d 1182, 1184 (10th Cir. 2001). Disability benefits are denied if the Commissioner shows that the impairment which precluded the

a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." *Id.*

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). This Court's review is limited to two inquiries: first, whether the decision was supported by substantial evidence; and, second, whether the correct legal standards were applied. *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).

Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion. *Id.* The court's review is based on the record taken as a whole, and the court will "meticulously examine the record in order to determine if the evidence supporting the agency's decision is substantial, taking 'into account whatever in the record fairly detracts from its weight.'" *Id., quoting Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994). The court "may neither reweigh the evidence nor substitute" its discretion for that of the Commissioner. *Hamlin,* 365 F.3d at 1214 (quotation omitted).

**Decision of the Administrative Law Judge**

The ALJ found that Tolbert's date last insured was September 30, 2003. (R. 15). At Step One, the ALJ found that Tolbert had not engaged in any substantial gainful activity during the relevant period, which was after Tolbert's alleged onset date of October 31, 2000 through the date last insured, September 30, 2003. *Id.* At Step Two, the ALJ found that Tolbert had severe impairments of status post fusion at L5-S1; status post fusion at C4-5 and C5-6; and status post hardware removal at L5-S1. *Id.* The ALJ discussed Tolbert's allegation of depression and stated

---

performance of past relevant work does not preclude alternative work. 20 C.F.R. § 404.1520.

that there was no evidence of any complaints of or treatment for depression before the date last insured, September 30, 2003. *Id.* Therefore, the ALJ found that Tolbert did not have a medically determinable mental impairment. *Id.* At Step Three, the ALJ found that Tolbert's impairments did not meet a Listing. *Id.*

> The ALJ determined that Tolbert had the following RFC through the date last insured:
>
> to occasionally lift and/or carry 10 pounds; frequently lift and/or carry up to 10 pounds; walk for at least 2 hours in an 8-hour workday; sit for at least 6 hours in an 8-hour workday; and avoid working above shoulder level.

(R. 16). At Step Four, the ALJ found that Tolbert could not perform her past relevant work. (R. 18). At Step Five, the ALJ found that there were jobs that Tolbert could perform, taking into account her age, education, work experience, and RFC. (R. 19). Therefore, the ALJ found that Tolbert was not disabled during the relevant period. *Id.*

## Review

Tolbert argues first that the ALJ should have found that she had a mental limitation at Step Two, and second that the ALJ's RFC determination did not include all of her limitations. Because the undersigned finds that the ALJ's decision is supported by substantial evidence and complies with legal requirements, the ALJ's decision is affirmed.

While Tolbert characterizes her first argument as the ALJ's failure to find that her depression was a severe impairment at Step Two, her real argument is that her depression should have been included in the ALJ's RFC determination. It is well-settled law in this circuit that any error at Step Two is harmless so long as the ALJ finds at least one condition to be severe, so that the five-step sequential evaluation continues. *Oldham v. Astrue*, 509 F.3d 1254, 1256-57 (10th Cir. 2007) (no error in ALJ's failure to include claimant's reflex sympathetic dystrophy as severe impairment at

Step Two); *Carpenter v. Astrue*, 537 F.3d 1264, 1266 (10th Cir. 2008) (any error at Step Two was harmless when ALJ properly proceeded to next step of evaluation sequence). Therefore, because the ALJ found severe impairments at Step Two, there was no reversible error at this step.

Tolbert's RFC argument is that the ALJ did not give credit to the opinions of Tolbert's treating physicians as required. She asserts that if the ALJ would have properly credited the treating physician opinion evidence, then the ALJ's RFC determination would have included limitations relating to Tolbert's depression and her limited range of motion of her neck.

Regarding opinion evidence, generally the opinion of a treating physician is given more weight than that of an examining consultant, and the opinion of a nonexamining consultant is given the least weight. *Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004). A treating physician opinion must be given controlling weight if it is supported by "medically acceptable clinical and laboratory diagnostic techniques," and it is not inconsistent with other substantial evidence in the record. *Hamlin*, 365 F.3d at 1215. *See also* 20 C.F.R. § 404.1527(d)(2). Even if the opinion of a treating physician is not entitled to controlling weight, it is still entitled to deference and must be weighed using the appropriate factors set out in Section 404.1527. *Langley v. Barnhart*, 373 F.3d 1116, 1119 (10th Cir. 2004). The ALJ is required to give specific reasons for the weight he assigns to a treating physician opinion, and if he rejects the opinion completely, then he must give specific legitimate reasons for that rejection. *Id.* When a treating physician's opinion is inconsistent with other medical evidence, it is the job of the ALJ to examine the other medical reports to see if they outweigh the treating physician's report, not the other way around. *Hamlin*, 365 F.3d at 1215 (quotation omitted).

The threshold inquiry, however, is whether Dr. Hastings gave any true opinion evidence as

contemplated by Social Security regulations. The Tenth Circuit in *Cowan v. Astrue,* 552 F.3d 1182, 1188-89 (10th Cir. 2008) explained that a "true medical opinion" was one that contained a doctor's "judgment about the nature and severity of [the claimant's] physical limitations, or any information about what activities [the claimant] could still perform." Thus, the court found that a statement by a treating physician that the claimant had a stroke "and I feel he may never return to work" was not a true medical opinion. *Id. See also Martinez v. Astrue,* 316 Fed. Appx. 819, 822-23 (10th Cir. 2009) (unpublished) (ALJ did not need to provide specific legitimate reasons for rejecting portion of treating physician's letter that contained only generalized statements); *Mann v. Astrue*, 284 Fed. Appx. 567, 570 (10th Cir. 2008) (unpublished) (treating physician recommendation that the claimant see an orthopedic specialist was not a treating physician opinion because it did not address functional limitations).

Regarding her allegations of depression, Tolbert argues that the ALJ had to take into account the opinion evidence of Dr. Hastings. This opinion evidence consisted of his statement in his letter dated December 3, 2003 that Tolbert suffered a "psychological overlay and clinical depression" that was "associated with a 5% permanent partial impairment to the whole person." (R. 173). Regarding the threshold of whether this statement constituted a true treating physician opinion, the undersigned finds that, under the circumstances of this case, it does not. First, this letter, just outside of the relevant time period, is the first reference to depression in Dr. Hastings' records, and therefore there is no evidence that Dr. Hastings was a treating physician insofar as any mental conditions of Tolbert. *Compare McTaggart v. Astrue*, 342 Fed. Appx. 373, 375 (10th Cir. 2009) (unpublished) (physicians appointed by workers compensation court were not treating physicians). Second, the letter is summary and in no way indicates any functional limitations that Tolbert had resulting from

depression, other than assigning a 5% impairment. *See Seever v. Barnhart*, 188 Fed. Appx. 747, 754 (10th Cir. 2006) (unpublished) (A 3% impairment rating given by Dr. Hastings "due to psychological overlay and clinic depression" did not require the ALJ to include a mental restriction in the RFC determination).

Substantial evidence supports the omission of any mental limitation from the ALJ's RFC determination. In his Step Two analysis, the ALJ stated that there was no evidence that Tolbert complained of depression or was treated for depression on or before her date last insured, September 30, 2003. (R. 15). This lack of evidence supports the ALJ's conclusion that there was no medically determinable mental impairment.

Further, even if the December 3, 2003 letter of Dr. Hastings was considered to be a treating physician opinion, this Court would find that the ALJ gave specific and legitimate reasons for rejecting that opinion. While the ALJ did not specifically reference the December 3, 2003 letter, he did discount the other opinion evidence of Dr. Hastings that was given during the relevant time period. (R. 18). He did this on the basis that the standards for disability under workers compensation law, which was clearly the context of Dr. Hastings' letters, are different from the standards used in the Social Security disability context. *Id.* It can be legitimate to discount an opinion given in the workers compensation context given the difference in meaning of terms. *See, e.g., Seever*, 188 Fed. Appx. at 753 (unpublished); *Jones v. Barnhart*, 53 Fed. Appx. 45, 47 (10th Cir. 2002) (unpublished). The Court believes that it is clear that the ALJ would have used this same reasoning to reject Dr. Hastings' statements in the December 3, 2003 letter. *Cobb v. Astrue*, 364 Fed. Appx. 445, 450 (10th Cir. 2010) (unpublished) (while ALJ's credibility assessment was summary, taking the decision as a whole the ALJ's findings regarding the claimant's testimony were

"clear enough" and did not violate rule against *post hoc* justification).[3]

Therefore, Tolbert's argument regarding her allegation that a mental limitation should have been included in the ALJ's RFC determination fails because Dr. Hastings was not a treating physician regarding mental impairments, he did not give a true treating physician opinion, and even if his workers compensation rating letter could be construed as a treating physician opinion, the ALJ would have used the same specific legitimate reason for rejecting it that he gave for Dr. Hastings' other opinions.

Tolbert's second argument is that the RFC did not include any limitations reflecting her "significant loss of range of motion" in her neck. Plaintiff's Brief, Dkt. #16, p. 10. She cites to the December 7, 2002 letter of Dr. Hastings which she says reflected significant range of motion limitation to her neck and which included some impairment for her cervical radiculopathy. (R. 178, 182-83). The undersigned does not disagree with Tolbert that the December 7, 2002 letter

---

[3] The ALJ did not mention or discuss the December 3, 2003 letter of Dr. Hastings, and therefore the Court's decision includes rationales that the ALJ did not include in his own decision. Judicial review is limited to the reasons stated in the ALJ's decision. Carpenter v. Astrue, 537 F.3d 1264, 1267 (10th Cir. 2008). However, the Court believes that the ALJ's failure to discuss the December 3, 2003 letter is analogous to the failure of the ALJ to discuss the claimant's cardiac problems in *Big Pond v. Astrue*, 280 Fed. Appx. 716, 719 n.2 (10th Cir. 2008) (unpublished). The Tenth Circuit rejected an argument that the Commissioner engaged in *post hoc* justification of the ALJ's decision when the issue raised by the claimant was that the ALJ had failed to discuss her cardiac problems:

> We have simply reviewed the record in order to determine whether, and then to illustrate why, the ALJ's omissions were not legal error. The ALJ was not required to provide grounds in the decision for failing to do what was not required. Thus, neither we nor the Commissioner have relied on a substitute rationale for upholding the ALJ's decision.

*Id.*

summarizes Dr. Hastings' findings regarding her neck condition, and it assigns a percentage of impairment under workers compensation rules. What the letter does not do, however, is give functional limitations, such as a statement that Tolbert should avoid jobs that required certain neck motions. Therefore, there would be some question about whether the December 12, 2002 letter is a "true medical opinion" that required the ALJ to give specific legitimate reason if he rejected that opinion. *See Cowan,* 552 F.3d at 1188-89 (a "true medical opinion" was one that contained a doctor's "judgment about the nature and severity of [the claimant's] physical limitations, or any information about what activities [the claimant] could still perform").

However, even if the December 12, 2002 letter was a treating physician opinion regarding Tolbert's neck issues, the undersigned finds that the ALJ gave sufficient reasons for rejecting that opinion, as described above, based on the difference in standards between workers compensation law and Social Security disability law. *See, e.g., Seever*, 188 Fed. Appx. at 753 (unpublished); *Jones*, 53 Fed. Appx. at 47 (unpublished).

The ALJ's RFC determination was supported by substantial evidence, including the FCE (R. 247-74), Dr. Marouk's release of Tolbert to full duty work with a 15 lb. restriction (R. 153), and the opinion evidence of nonexamining consultant Dr. Fiegel (R. 215-22). *Cowan*, 552 F.3d at 1189-90 (opinion evidence of nonexamining consultants can constitute substantial evidence); *Flaherty v. Astrue*, 515 F.3d 1067, 1071 (10th Cir. 2007) (ALJ entitled to consider nonexamining physician's opinion); *Weaver v. Astrue*, 353 Fed. Appx. 151, 154-55 (10th Cir. 2009) (unpublished) (nonexamining opinion was substantial evidence supporting RFC determination). Because the ALJ's decision was based on substantial evidence, and it complied with legal standards, the decision is affirmed.

**Conclusion**

The decision of the Commissioner is supported by substantial evidence and the correct legal standards were applied. The decision is **AFFIRMED**.

Dated this 11th day of March, 2011.

Paul J. Cleary
United States Magistrate Judge